2001 WY 56

**Gerri E. McCULLOH, f/k/a Gerri E. Drake, Appellant (Plaintiff),**

v.

**John W. DRAKE, Appellee (Defendant).**

**John W. Drake, Appellant (Defendant),**

v.

**Gerri E. McCulloh, f/k/a Gerri E. Drake, Appellee (Plaintiff).**

Nos. 99–316, 99–317.

Supreme Court of Wyoming.

June 15, 2001.

---

Representing Gerri McCulloh: C. John Cotton, Gillette, WY. Argument by Mr. Cotton.

Representing John Drake: Ann M. Rochelle of Williams, Porter, Day & Neville,

P.C., Casper, WY, and John D. Ward, Sheridan, WY. Argument by Ms. Rochelle.

Before LEHMAN, C.J., and THOMAS,* MACY,** GOLDEN, and HILL, JJ.

LEHMAN, Chief Justice.

[¶ 1]   The marriage of Gerri E. McCulloh (the wife) and John W. Drake (the husband) endured for approximately three and a half years before the wife sought a divorce. One son was produced by the marriage. The parties' divorce proceedings involved tort allegations in addition to the usual issues regarding child custody, child support, alimony, and property division. Neither party was completely satisfied with the way the trial court decided the various issues, and they both filed appeals.

[¶ 2]   We affirm in part, reverse in part, and remand.

### ISSUES

[¶ 3]   The wife presents the following issues for our review:

Issue No. 1:  Did the Court err in ordering divided custody, and in granting divided custody and primary decision making authority to a known perpetrator of domestic abuse?

Issue No. 2:  Did the Court err in connection with child support calculations?

Issue No. 3:  Did the Court err in connection with property settlement issues?

Issue No. 4:  Did the Court err in sua sponte denying Plaintiff a jury trial on tort issues?

Issue No. 5:  Did the Court err in failing to apply controlling Wyoming law in connection with the determination of punitive damages?

Issue No. 6:  Did the Court err in ordering payment to the GAL directly from the parties, instead of out of the marital estate generally, prior to distribution?

The husband seeks our review of issues pertaining to the tort claims:

1.   As to Wife's tort claims, Husband is only contesting the tort claim findings and rulings as to the September, 1997 pillow incident. Husband specifically raises the following issues: (a) While Wyoming has abrogated interspousal immunity and has adopted the tort of emotional distress, does Wyoming recognize the tort of intentional infliction of emotional distress in a marital context? (b) If the tort does exist in a marital setting, Husband's conduct with regard to the pillow incident in September, 1997 was not outrageous; Husband did not act with the requisite intent; Wife did not suffer severe emotional distress; and Husband's alleged conduct of inflicting ... emotional harm did not proximately cause[ ] Wife's damages.

2.   As to punitive damages, Husband asserts that Wife failed in the first instance to make a prima facie case and/or prove her claim for punitive damages by a preponderance of the evidence.

3.   If this case is remanded as to the tort issues, Husband should be allowed to have Wife's counseling, psychological, psychiatric and medical records prior to marriage so as to demonstrate Wife's condition prior to the marriage. The Trial Court improperly limited Husband's access to Wife's medical, psychological, psychiatric and counseling records to those since the date of the marriage.

4.   If this case is remanded, Husband should be allowed to take the deposition of Cody McCulloh Cabe, Wife's son from her first marriage.

### FACTS

[¶ 4]   The husband and the wife were married on March 5, 1994. The wife had one son from a prior marriage, and the couple had another son in October of 1994. During the marriage, the family lived on a ranch that the husband purchased prior to the marriage. After moving to the ranch, the couple commenced the operation of a Morgan horse business.

[¶ 5]   The wife asserts that, beginning shortly after the marriage, the husband began a pattern of physical and sexual abuse.

* Concurred prior to retirement.

** Retired June 2, 2000.

She maintains that various incidents of abuse led up to an encounter where the husband held a pillow over her face, which ultimately caused her departure from the relationship. The wife left her husband on October 4, 1997, and filed for divorce on December 31, 1997. On October 29, 1998, the wife filed the complaint wherein she asserted the various tort claims and requested a jury trial. The trial court denied the jury trial request and, from July 26, 1999, through July 30, 1999, heard evidence pertaining to child custody, child support, property division, alimony, attorney and guardian *ad litem* fees, the tort claims, and punitive damages.

[¶ 6] At the conclusion of the trial, the trial court awarded shared physical custody of the child but gave primary decision-making power regarding medical and educational issues to the husband. It also awarded $1,200 per month to the wife for child support. Regarding the property that was acquired before and during the marriage, the trial court made the following finding:

Prior to the marriage Father was worth about 3.9 million and at the time of separation he was worth about 4.9 million (EX. YYYY–2). The 1 million in increased worth during this marriage was primarily due to more inheritance-not earned appreciation. Very little evidence supports the proposition that Father's holdings appreciated as a result of Plaintiff's efforts. The horse business pursued by both parties lost considerable amounts during this marriage.

The wife was allowed to keep the $100,000 she withdrew from the parties' joint bank account in October of 1997 as well as the $50,000 the husband was ordered to pay her. She was also awarded $200,000, the financial contributions made by the husband to her son from a previous marriage, her personal bank accounts and investment portfolio, four horses, two miniature donkeys, a pickup and horse trailer, a house in Sheridan, and items personal to her. The trial court awarded the husband his bank accounts and investment portfolio that included his inheritance from his parents and grandmother, fifteen horses, his interest in the various properties he owned before the marriage, the ranch that the couple and the boys lived on during the marriage, several vehicles and trailers, and items personal to him.

[¶ 7] The trial court allowed the wife to keep the temporary spousal support of $1,400 per month she was given from March 1998 through August of 1999 but ruled that she was not entitled to any future alimony, finding the property division took into account any entitlement to future alimony. Finally, the trial court ordered the husband and the wife to split the guardian *ad litem* fees and to bear the responsibility for their own attorney fees and costs.

[¶ 8] In addressing the various tort claims, the trial court found, regarding the claims of negligent infliction of emotional distress, intentional infliction of emotional distress (except for the pillow incident), outrageous conduct, and sexual assault, that the wife failed "to state a claim for which relief can be granted; to prove the claim by a preponderance of the evidence; to present sufficient evidence on damages; and/or to timely file some allegations." Specifically with regard to the sexual assault claim, the trial court found that the wife "failed to prove by a preponderance of the evidence that a tortious sexual assault occurred."

[¶ 9] The trial court found that the wife did prove a tort occurred in September of 1997 when the husband briefly held a pillow over her face and concluded that, although she did not currently suffer a disability, there was some proof she suffered emotional distress as a result of the incident. Accordingly, the trial court awarded damages of $4,250 and $750 in punitive damages, using the following rationale to arrive at the latter figure:

Given the incompatibility of these parties, conflict was inevitable. Happily, there were no stitches nor broken bones. Still, court decisions must reflect society's disdain for domestic abuse of any type. Hence, the Court finds punitive damages are appropriate.

. . . The Court finds the September 1997 incident where Defendant covered Plaintiff's head briefly with a pillow most closely resembles a battery under W.S. 6–2–501(b). The maximum criminal fine for violating this statute is $750.00.

[¶ 10] Neither party was satisfied with the trial court's final decision, and they each filed an appeal. In the wife's appeal, she takes issue with the divided custody order, the award of primary decision-making authority to the husband, the child support award, and the property settlement. The wife also claims that the trial court should not have denied her request for a jury trial on the tort issues and it failed to apply controlling Wyoming law with regard to the punitive damages. She lastly complains that the trial court ordered each party to pay half of the guardian *ad litem* fees rather than requiring payment from the marital estate prior to distribution. The husband questions whether Wyoming recognizes the tort of intentional infliction of emotional distress in a marital context and, if so, whether the elements of that tort were satisfied with regard to the pillow incident. He also asserts that the wife failed to prove her claim for punitive damages by a preponderance of the evidence. Finally, he requests discovery of the wife's psychological records from prior to the marriage and seeks to take the deposition of the wife's son from a previous marriage if the case is remanded.

## DISCUSSION

### A. Child Custody & Support

[¶ 11] The wife asserts that the trial court erred when it ordered divided custody and gave primary decision-making authority to a perpetrator of domestic violence. The husband responds that the trial court properly applied the best-interests-of-the-child standard.

[¶ 12] After the parties' oral arguments in this court, the wife filed a Petition for Modification of Decree of Divorce to Place Primary Custody With Petitioner (Mother) as Child's Historic Primary Care Provider with the trial court. The trial court found that the circumstances since the entry of the Decree of Divorce had substantially changed and ordered custody of the parties' son to be changed to the wife. The husband has appealed from that order. Because the circumstances surrounding this issue have changed so significantly and because the trial court's order which pertains to the most recent facts

has been appealed since the case at bar was heard, we have decided to reserve our discussion on this issue for our opinion in that case.

### B. Property Settlement

[¶ 13] The wife claims that the trial court erred when it divided the property. She contends that the husband's inheritance from his parents and grandmother should be divided so she can maintain a comparable standard of living, arguing that his entire estate was used to support the family and maintain the family's standard of living. The husband replies that the trial court's property division was fair and equitable and the wife is not entitled to any of the wealth he inherited or brought into the marriage.

[¶ 14] When the parties married, the husband's net worth was approximately $3.9 million. During the marriage, he continued to receive substantial monetary gifts from his mother. At the time of the parties' separation, the husband was worth approximately $4.9 million. After the wife left her husband but shortly before she filed for divorce, the husband's mother died, and he became a vested beneficiary of both his mother's and grandmother's trusts/wills. By the time of trial, the husband's net worth had increased to approximately $10 million. This increase in his wealth was due solely to the gifts and inheritance from his mother rather than to the parties' efforts given that their horse business lost money.

[¶ 15] In analyzing property division awards, we are guided by the following principles:

"We apply an abuse of discretion standard when reviewing divisions of marital property and, recognizing that property settlements present complex problems requiring the trial court to assess the respective merits and needs of the parties, we will not disturb the result absent a manifest abuse of that discretion. *France v. France*, 902 P.2d 701, 703 (Wyo.1995); *Neuman v. Neuman*, 842 P.2d 575, 578 (Wyo.1992); *Kennedy v. Kennedy*, 456 P.2d 243, 247 (Wyo.1969). We will find an abuse of discretion when the disposition shocks the conscience of the court and appears so

unfair and inequitable that reasonable persons could not abide it. *France*, 902 P.2d at 703. 'In applying these standards, we review the evidence on appeal in the favor of the successful party below, ignoring the evidence of the unsuccessful party, and granting the successful party every reasonable inference that can be drawn from the record.' *Id.* at 703–04."

*Carlton v. Carlton*, 997 P.2d 1028, 1030–31 (Wyo.2000) (quoting *Mann v. Mann*, 979 P.2d 497, 500 (Wyo.1999)). Wyo.Stat.Ann. § 20–2–114 (LEXIS 1999) (amended 2000) required a trial court to distribute property in a just and equitable manner:

In granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children.

This court has held that a just and equitable division of property is as likely as not to be unequal. *France v. France*, 902 P.2d 701, 704 (Wyo.1995). Relying on our rule that "property which is subject to division under our statute consists of property which is the product of the marital union and was acquired during the course of the marriage by the joint efforts of the parties," we have held that gifted or inherited property can be properly awarded to the party by whom it was inherited or given. 902 P.2d at 704, 706.

[¶ 16] In this case, the husband's wealth was acquired and increased by gifts and inheritance from his parents and grandmother rather than from the couple's efforts during their marriage. Although the wife testified that one of her counselors thought she was going through too much with her divorce case to be able to hold down a job, she did not present any medical or other reason why she could not or should not find gainful employment. She has three and one-half years of college credit, operated computers, and worked in the radio industry for many years, and, although the wife had been thinking about employment options she would like to

pursue, she testified that she was waiting until her case was resolved before acting on any of those ideas. We conclude that the factors set out in our statute as well as prior case law support the trial court's decision to divide the property as it did. We, therefore, affirm this portion of the trial court's order.

[¶ 17] The wife also complains that the trial court required her to pay one-half of the fees for the child custody evaluator and for the guardian *ad litem* as well as to reimburse the husband for medical expenses and a charge for household items she incurred during the marriage. She also challenges the trial court's decision to allow the husband to use the couple's child as a deduction on his federal income tax return.

[¶ 18] It is a well established rule that the trial court's determination with respect to the allocation of costs will not be overturned on appeal unless the record demonstrates a clear abuse of discretion. *Carlson v. Carlson*, 888 P.2d 210, 216 (Wyo.1995). Additionally, although a trial court should consider tax issues presented by the parties, it is not required to consider potential tax ramifications not raised by the parties. *Sellers v. Sellers*, 775 P.2d 1029, 1033 (Wyo. 1989).

[¶ 19] It is rare when a marriage dissolves for either party to be satisfied with the trial court's final decision. It is for this reason that trial courts impress upon the parties the benefits to coming to a mutual decision between themselves rather than leaving the property division decisions to the trial court. The parties in this case did not follow this advice, and neither is completely happy with the disposition. The wife, however, has failed to demonstrate that the trial court abused its discretion. Consequently, we decline to alter the final property distribution with regard to the property division order or with regard to the assessment of fees and costs.

### C. Intentional Infliction of Emotional Distress in a Marriage Context

#### 1. Should the Tort Be Adopted in a Marital Setting?

[¶ 20] The husband claims that the wife's intentional-infliction-of-emotional-distress

claim should have been dismissed because this court has not recognized the tort in a marital context. Although Wyoming has abrogated interspousal immunity and has adopted the tort of intentional infliction of emotional distress, we have not had the opportunity to address whether the tort is available in a marital context. *Tader v. Tader*, 737 P.2d 1065, 1069 (Wyo.1987); *Leithead v. American Colloid Co.*, 721 P.2d 1059, 1065 (Wyo.1986). When this court adopted the intentional-infliction-of-emotional-distress cause of action, we adopted the definition provided by the Restatement (Second) of Torts § 46 (1965). *Leithead*, 721 P.2d at 1065. To recover under an intentional-infliction-of-emotional-distress claim, "a plaintiff must prove that the defendant's conduct was extreme and outrageous and that the defendant intentionally or recklessly caused the plaintiff to suffer severe emotional harm." *Anderson v. Solvay Minerals, Inc.*, 3 P.3d 236, 241 (Wyo.2000).

[¶ 21] Courts and legislatures have historically tried to remain uninvolved in regulating behavior within a marriage in an effort to preserve domestic harmony. Meredith L. Taylor, Comment, *North Carolina's Recognition of Tort Liability for the Intentional Infliction of Emotional Distress During Marriage*, 32 Wake Forest L.Rev. 1261, 1267 (1997). Recently, however, courts have begun to acknowledge claims for civil relief in the marital context, reasoning that a tort claim may provide a better remedy than a divorce action does. *Id.* Indeed, judicial recognition of emotional distress claims in the context of marriages has been described as a "national trend." *Id.*

[¶ 22] Those who oppose recognizing civil relief among married persons worry that (1) it will open the floodgates to a host of frivolous litigation; (2) because married persons share an intensely personal and intimate relationship, when discord arises, it is inevitable they will suffer emotional distress, often severe; and (3) the inquiry into whether a spouse's conduct is extreme and outrageous constitutes too great an intrusion into the marital relationship.

[¶ 23] We acknowledge and have seriously contemplated these concerns. In many marriages, and undoubtedly in most troubled marriages, a high level of emotional antagonism exists between the spouses, and it is likely that volatile circumstances will often be perceived as extreme and outrageous. We have questioned whether legal intrusion into behavior which occurs within a marriage is appropriate and whether legal relief in addition to a divorce is justified for an intentional-infliction-of-emotional-distress claim in light of this fact. We conclude they are. Emotional distress is as real and tormenting as physical pain, and psychological well-being deserves as much legal protection as physical well-being. *Henriksen v. Cameron*, 622 A.2d 1135, 1139 (Me.1993). Although the preservation of marital harmony is a respectable goal, behavior which is truly outrageous and results in severe emotional distress should not be protected in some sort of misguided attempt to promote marital peace. *Id.*

[¶ 24] In coming to this decision, we also identified the responsibility to guard against frivolous litigation. Only situations involving atrocious and outrageous behavior should be compensated; conduct which is merely insulting or offensive should not. Taylor, *supra*, at 1264.

> [M]ost marriages do not include conduct that will support an action for emotional distress. While most marriages ending in divorce see their share of insults, indignities, threats, annoyances and petty oppressions as well as transient and trivial mental anguish, the Restatement expressly excludes such things from forming the basis for liability.

Bradley A. Case, Note, *Turning Marital Misery into Financial Fortune: Assertion of Intentional Infliction of Emotional Distress Claims by Divorcing Spouses*, 33 U. Louisville J. Fam. L. 101, 115 (1994).

[¶ 25] We emphasize that a high standard for recovery shall exist and direct trial courts to be especially cautious when handling such claims. The focus of such claims must be on the element of outrageousness, and the scrutiny must be stringent enough so that the social good which comes from recognizing the tort in a marital setting will not be undermined by an invasive flood

of meritless litigation. *Henriksen*, 622 A.2d at 1139. The plaintiff must demonstrate that the defendant's conduct was so "extreme and outrageous" that it exceeded "all possible bounds of decency." Restatement, *supra*, § 46 cmt. d. In addition:

> It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*Id.*, at cmt. h. Accordingly, we intend for motions for summary judgment to be carefully considered in an effort to protect defendants from the possibility of long and intrusive trials on frivolous claims. *Henriksen*, 622 A.2d at 1139–40.

[¶ 26] We are convinced that extreme and outrageous conduct by one spouse which results in severe emotional distress to the other spouse should not be ignored by virtue of the marriage of the victim to the aggressor and hold that such behavior can create an independent cause of action for intentional infliction of emotional distress. In making this decision, we set the threshold of outrageousness high in hopes it will adequately defend against a flood of frivolous litigation.

### 2. Joinder

[¶ 27] The wife complains that the trial court's decision to hear the tort issues along with the divorce issues deprived her of her right to have a jury decide her tort claims. Relying on W.R.C.P. 38(a), the husband replies that the wife was not entitled to a jury trial because her action did not exclusively involve the recovery of money.

[¶ 28] A civil action in tort is fundamentally different from a divorce proceeding. *Henriksen*, 622 A.2d at 1141. The issues involved in each are entirely distinct, and the procedure involved in divorce actions, which are purely equitable, makes joining tort claims impracticable. *Id.*

> "The purpose of a tort action is to redress a legal wrong in damages; that of a divorce action is to sever the marital relationship between the parties, and where appropriate, to fix the parties' respective rights and obligations with regard to alimony and support, and to divide the marital estate."

*Id.* (quoting *Heacock v. Heacock*, 402 Mass. 21, 520 N.E.2d 151, 153 (1988) (citations omitted)).

[¶ 29] A most basic procedural difference between tort and divorce actions is the right to a jury trial in tort actions.

> "[D]ivorce actions will become unduly complicated in their trial and disposition if torts can be or must be litigated in the same action. A divorce action is highly equitable in nature, whereas the trial of a tort claim is at law and may well involve, as in this case, a request for a trial by jury. The administration of justice will be better served by keeping the proceedings separate."

*Simmons v. Simmons*, 773 P.2d 602, 604 (Colo.Ct.App.1988) (quoting *Lord v. Shaw*, 665 P.2d 1288, 1291 (Utah 1983)). Moreover, joining the actions risks unacceptable delays:

> "Resolution of tort claims may necessarily involve numerous witnesses and other parties such as joint tortfeasors and insurance carriers whose interests are at stake. Consequently, requiring joinder of tort claims in a divorce action could unduly lengthen the period of time before a spouse could obtain a divorce and result in such adverse consequences as delayed child custody and support determinations."

*Stuart v. Stuart*, 143 Wis.2d 347, 421 N.W.2d 505, 508 (1988) (quoting *Stuart v. Stuart*, 140 Wis.2d 455, 410 N.W.2d 632, 638 (Ct.App. 1987)).

[¶ 30] The goal to promote judicial economy should not be sought at the expense of fair and proper consideration of the parties' issues. "Jurors, many of whom are themselves married, are in the best possible position to determine what behavior between spouses is 'atrocious and utterly intolerable in a civilized community,' [Restatement (Second) of Torts § 46 (1965) ], and what behav-

ior is within the 'ebb and flow' of married life." *Henriksen,* 622 A.2d at 1139.

### 3. *Res Judicata*

[¶ 31] Because our holding precludes tort issues from being joined with marital dissolution issues, we feel compelled to address how the doctrine of res judicata affects this situation. The doctrine of res judicata prohibits the relitigation of claims upon which there has been a full and fair opportunity to litigate in a court of competent jurisdiction. *RKS v. SDM by TY (Paternity of SDM),* 882 P.2d 1217, 1221 (Wyo. 1994). "Res judicata can be described generally as that rule which precludes the presentation by parties or those in privity with them of the same claim that was resolved by an earlier judgment." *Id.* Res judicata avoids inconsistent decisions, limits parties to one opportunity to try their cases on the merits, and prevents the legal system from becoming unmanageable. *Id.*

> The criteria used to determine res judicata's applicability to a situation are: "(1) the parties were identical; (2) the subject matter was identical; (3) the issues were the same and related to the subject matter; and (4) the capacities of the persons were identical in reference to both the subject matter and the issues between them."
>
> *Newell v. Trumper,* 765 P.2d 1353, 1355 (Wyo.1988) (quoting *Swasso [v. State ex rel. Wyoming Worker's Compensation Division],* 751 P.2d [887,] 890 [(Wyo.1988)]).
>
> *Osborn v. Painter,* 909 P.2d 960, 964 (Wyo. 1996).

[¶ 32] Under the doctrine of res judicata, a final judgment on the merits in a prior action is conclusive and bars all subsequent actions between the same parties, or their privies, as to all matters which were or might have been litigated in the prior action. *State, Department of Family Services v. PAJ,* 934 P.2d 1257, 1260 (Wyo.1997). Before res judicata will act as a bar to subsequent claims, the claims in the subsequent action must be identical to those in the first proceeding. *Osborn,* 909 P.2d at 964. We, therefore, must analyze the two types of actions involved in this case.

[¶ 33] As we stated above, the purpose of a divorce is to dissolve a marriage, which includes consideration by a judge of issues such as child custody, child support, and alimony. A tort action is brought to recover compensation for injuries suffered as a result of a civil wrong and is normally decided by a jury. *Henriksen,* 622 A.2d at 1141. These types of actions are fundamentally different, and the issues involved in each are completely unrelated. *Id.* Consequently, the requisite identical subject matter for the doctrine to bar the subsequent action does not exist. The fact that Wyoming allows fault to be considered in divorce proceedings does not convince us otherwise. Section 20–2–114. The two actions simply do not involve the same claim.

[¶ 34] We conclude that the efficient administration of divorce actions requires their separation from actions at law and such separation of the claims will not trigger the res judicata doctrine. The wife's tort claims were improperly joined with the divorce action. We reverse the trial court's decision to join the causes of action together in one proceeding and remand for a determination by a jury.

### D. *Tortious Sexual Assault*

[¶ 35] Among the tort claims the wife asserted was an allegation of sexual assault and battery. The trial court, however, found that she failed "to state a claim for which relief can be granted; to prove the claim by a preponderance of the evidence; to present sufficient evidence on damages; and/or to timely file some allegations." Specifically with regard to the sexual assault claim, the trial court found that the wife "failed to prove by a preponderance of the evidence that a tortious sexual assault occurred." The husband maintains that there was no sexual assault and this claim is barred by the statute of limitations.

[¶ 36] The husband attempts to argue that the statute of limitations for civil sexual assault is one year despite the fact that the statute specifically states civil sexual assault cases should not be included in the one-year limitation period. He bases this argument

on the assumption that the elements for tortious sexual assault are the same as for assault and battery, citing two Connecticut cases wherein the elements for tortious sexual assault were held to be the same as for assault and battery.

[¶ 37]  The applicable statute provides in pertinent part:

(a) Civil actions other than for the recovery of real property can only be brought within the following periods after the cause of action accrues:

. . .

(iv) Within four (4) years, an action for:

. . .

(C) An injury to the rights of the plaintiff, not arising on contract and not herein enumerated; and

. . . .

(v) Within one (1) year, an action for:

. . .

(B) Assault or battery not including sexual assault[.]

Wyo.Stat.Ann. § 1–3–105(a) (LEXIS 1999).

[¶ 38]  Following the statute's plain language, we conclude that the statute of limitations for civil sexual assault is four years.  Because some of the allegations in this case occurred more than four years prior to the filing of this claim, to the extent that the incidents complained of fall within the appropriate period of time, we reverse and remand the trial court's decision on this issue for a jury determination.

## E.  *Discovery—The Wife's Past Records and Deposition of Her Oldest Son*

[¶ 39]  The husband requested the production of the wife's medical, counseling, psychiatric, and psychological records from prior to the marriage.  He also expresses the desire to depose the wife's oldest son.  The wife argues that the husband had access to volumes of information and he was not entitled to go on a fishing expedition into records dated before the marriage.  She opposes our consideration of the issue of the deposition of her son because the husband did not bring this issue to the trial court's attention.  She insists that, if the case is remanded and the husband wants to conduct a deposition of her son, issues associated therewith can be addressed by the trial court then.

[¶ 40]  We agree with the wife that the trial court can address the issue of the requested deposition of her oldest son on remand.  Regarding the past records issue, however, we side with the husband.  Requests for depositions and for the production of documents are controlled by W.R.C.P. 26, which provides in pertinent part:

(b) Discovery Scope and Limits.  Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(1)(A) In General.  Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

(B) Limitations. The frequency or extent of use of the discovery methods set forth in subdivision (a) may be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.  The court may act upon its own initiative

after reasonable notice or pursuant to a motion under subdivision (c).

[¶ 41]  Some of the issues in this case raise questions about the wife's mental health.  The evidence at trial demonstrated that she had endured some emotionally stressful events prior to her marriage, and the husband's expert requested the complete file of her mental health records.  The wife argues that to allow the husband access to counseling records dated ten to fifteen years earlier would result in an impermissible fishing expedition.

[¶ 42]  The child custody dispute in this case involved allegations by the husband that the wife has been emotionally erratic and explosive in front of their child, and he presented evidence to that effect.  In the wife's tort issues, she asserted that she suf-fered severe emotional distress as a result of the husband's outrageous behavior.  We conclude that a mental health expert should be given a complete record of relevant facts to be able to adequately evaluate the issues and make an intelligent decision.  We, therefore, reverse the trial court's denial of the husband's request to discover a complete version of the wife's mental health records.

[¶ 43]  Affirmed in part, reversed in part, and remanded in accordance with this opinion.